# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

FIELDTURF USA, INC., a Florida corporation, and
FIELDTURF TARKETT INC., a Canadian company,

            Plaintiffs,
                                  Civil Action No. 07-11306
                                  Hon. Avern Cohn

    vs

AIRSIDE TURF, INC., a Michigan corporation, and
JOSEPH DOBSON, an individual

            Defendants.

---

THE WATSON IP GROUP, PLC
Jovan N. Jovanovic (P66644)
Attorney for Plaintiffs
3133 Highland Drive, Suite 200
Hudsonville, MI  49426
(616)855-1521

FACTOR & LAKE, LTD.
Jody L. Factor
Attorneys for Plaintiffs
1327 W. Washington Blvd.
Suite 5G/H
Chicago, IL 60607
(312) 226-1818

HONIGMAN MILLER SCHWARTZ
AND COHN LLP
William D. Sargent (P38143)
Henry J. Andries, Jr. (P53669)
Robert J. Muchnick (P62369)
Attorneys for Defendants
2290 First National Building
Detroit, MI 48226
(313) 465-7000

---

## AFFIDAVIT OF JOSEPH R. DOBSON II

STATE OF MICHIGAN     )
                              )SS
COUNTY OF OAKLAND    )

      Joseph R. Dobson II, being first duly sworn, deposes and says:

      1.       I, Joseph R. Dobson II, have personal knowledge of the facts set forth in this affidavit, am competent to testify to these facts, and will so testify if called and sworn as a witness.

      2.       Prior to working for Air FieldTurf, I worked for AvTurf, LLC ("AvTurf") from approximately January of 2002 through July of 2002.  My duties included marketing AvTurf's synthetic turf applications to airports.

      3.       On September 13, 2002, before I began working for Air FieldTurf, I signed a document titled "Confidentiality Agreement."  I signed this document in connection with discussions about a potential business relationship with FieldTurf, Inc. and before FieldTurf Inc. offered me employment.

      4.       From approximately late September of 2002 until late December of 2005, I worked for FieldTurf's Air FieldTurf division.  My assigned job title was Vice President, and my job duties included marketing Air FieldTurf's synthetic turf applications to airports.  I did not have a non-compete or non-solicitation agreement with either FieldTurf Inc., FieldTurf Tarkett Inc., FieldTurf USA, Inc. or Air FieldTurf.  Although I provided services for FieldTurf's Air FieldTurf division, I received my compensation and benefits from FieldTurf USA, Inc.  I worked from home in Milford, Michigan.

5.      In approximately October 2005, FieldTurf presented me with a proposed "Consultant Agreement" to perform sales and marketing related services for Air FieldTurf as an independent contractor. A copy of the proposed "Consultant  Agreement" presented to me is attached to this Affidavit as Exhibit A.

6.      I did not sign the proposed "Consultant Agreement" attached as Exhibit A. In approximately November 2005, FieldTurf prevented me from accessing my e-mail and the computer system. On or about December 24, 2005, FieldTurf terminated my employment.

7.      After my employment relationship with FieldTurf ended in December 2005, I have primarily worked as a consultant in the airside applications for synthetic turf industry. In May 2006, I formed AirSide Turf, Inc. Beginning in approximately late October of 2006, I began performing services for AvTurf. I was also involved in the purchase of AvTurf by a third party. The AvTurf purchase occurred on or about March 30, 2007.

*Joseph R. Dobson II*

JOSEPH R. DOBSON II

Subscribed and sworn to before me
this 21st day of June , 2007

*Barbara A. Williams*

Notary Public, Wayne County, MI
My Commission Expires:

Barbara A. Williams
Notary Public, State of Michigan, County of Wayne
My Commission Expires 9/10/2011
Acting in the County of Wayne

4

# EXHIBIT A



## CONSULTANT AGREEMENT

**BY AND BETWEEN:**            **AIR AIRFIELDTURF INC.**, a duly incorporated company having a place of business at 8088 Montview, Montreal, Quebec, H4P 2L7, herein acting and represented by John Gilman, duly authorized for the purposes hereof as he hereby declares (hereinafter referred to as "AFT"),

**AND:**            **JOE DOBSON**, businessman, domiciled and residing in the state of Michigan (hereinafter referred to as the "Executive"),

The Parties hereto agree as follows:

1- This agreement shall be governed and interpreted in accordance with the laws of the Province of Quebec;

2- The Executive has completed 3 years of service as an independent consultant to AFT;

3- The Executive shall have the title and perform the function of Executive Vice-President of Sales and Marketing and shall report to AFT;

4- The Executive shall carry out his obligations on a full time basis with the understanding that frequent travel and work in foreign countries are required;

5- The Executive will submit business expenses monthly, which shall be repaid within the following month. Only budgeted business expenses, pre-approved in writing by AFT will be reimbursed.

6- The Executive will use his best efforts to supply AFT with superior advice, information, knowledge, and judgement regarding the business, customers (actual and future), products, the marketing of products; and the carrying out his duties and obligations hereunder to sell the products;

7- The term of this agreement shall be indefinite, commencing October 1st, 2005, renewable indefinitely, by agreement by the parties;

8- The Executive has concurrently signed and agrees to be bound by the non-disclosure agreement, the non-competition agreement, and the non-solicitation agreement attached to this agreement as Schedule A;

9- The Executive shall be paid a draw on commission of $100,000.00USD per year;

10- The Executive shall be paid a commission of $0.05 USD per square foot on all sales of product sold by the Executive. In addition the Executive shall be eligible for commission on sales by any other sales representative, whom he assisted, subject to the entire discretion of AFT;

11- Where net margins on the sale of product by the Executive exceed 35%, the Executive shall receive an increase in commission subject to the entire discretion of AFT;

12- The Executive shall be eligible to receive a bonus in the case where total sales exceed the Board approved sales budget in any calendar year subject to the entire discretion of AFT. A bonus granted in any year or years does not constitute an acquired right to future bonus;

13- Commission will be payable on sales fully paid;

14- It is understood that as an independent contractor the Executive shall look after his own insurance costs and benefits;

15- The undersigned acknowledge that they have requested that this Agreement and all related documents be drawn up in English.  Les soussignés reconnaissent avoir exigé que cette convention, ainsi que tous les documents qui s'y rattachent, soient rédigés en anglais seulement.

Signed as at Montreal as at October 1st, 2005

Air FieldTurf Inc.


Per: _____          _____
        John Gilman, CEO                         Joe Dobson

<u>SCHEDULE A</u>

## INTELLECTUAL PROPERTY AND INVENTION AGREEMENT AND
## AGREEMENT NOT TO COMPETE

THIS AGREEMENT is executed nunc pro tunc as of (put in the most recent date Joe's compensation

plan was changed or re-agreed to October 1st, 2005 by and between the undersigned Executive

("Executive"), and Air AFT, Inc. ("AFT").

AFT's activities and business utilize trade secrets, proprietary and confidential information, including, but

not limited to, business plans, projections and financial information, and other intellectual property, to

which Executive will have and has had access.  In consideration of Executive's contract with AFT, the

Executive and AFT mutually agree to the following:

1.      a.      <u>Non-Disclosure of Intellectual Property</u>. During the term of the contract, and at all times

thereafter, Executive will not, except in promoting the business of AFT and performing his duties, use or

disclose, directly or indirectly, any of AFT's Intellectual Property (as that term is defined below) without

AFT's written consent.

        b.      <u>Definition of Intellectual Property</u>. As used in this Agreement, the term

"Intellectual Property" shall mean all information disclosed to or known by Executive as a consequence

of Executive's business with AFT which is not generally known to the public or in the industry in which

AFT does business, or in which it may become engaged in the future, concerning AFT's products,

processes, formulas, designs, plans, projections, financial condition or position, business plans,

customer lists and services, including, but not limited to, information relating to research, development,

inventions, manufacturing, purchasing, engineering and/or marketing.

        c.      <u>Return of Intellectual Property</u>.  Upon termination of Executive's contract

with AFT, Executive agrees to immediately return to AFT all documents, records, data, computer disks,

notebooks, and drawings, which contain or reflect Intellectual Property, and all other repositories of Intellectual Property, including all copies thereof, whether prepared by Executive or by others.

2.    Inventions.  Executive hereby agrees to keep AFT informed of any and all inventions, designs, formulas, works of authorship, compositions of matter and discoveries of any type (hereinafter the "Inventions") made, conceived of or developed by Executive, alone or in conjunction with others, which result from any work Executive may do during, and for six (6) months following the termination of, Executive's contract with AFT, and which may or may not be relative to AFT's activities or to those of affiliated companies.  All such inventions shall be disclosed to AFT in writing.  It shall be AFT's policy to release to Executive any such inventions determined by AFT not to be conceived of or developed on AFT's time, or using AFT's resources, or related to AFT's activities.  Absent the foregoing, any and all such inventions shall be and shall remain the property of AFT or its nominees, whether patented, copyrighted or not, and Executive shall, without charge to AFT, assign, and hereby agrees to assign, to AFT all right, title and interest in and to the Inventions and copyrights.  Upon request, Executive will immediately execute, acknowledge, and deliver any instruments confirming AFT's complete ownership of the Inventions.

3.    Agreement Not to Compete.  During the term of Executive's contract with AFT, and for a period of twelve (12) months after the termination, for any reason thereof, Executive covenants that he/she shall not, in any manner, directly or indirectly, as an Executive, owner, proprietor, principal, partner, officer, director, stockholder, member, agent or representative, invest, engage, participate or become interested in, affiliated or connected with, or otherwise render services to, any person or organization engaged in the ownership or operation of any business that is the same as, similar to, or in competition with AFT business, anywhere within the United States of America or Canada.  This prohibition, however, shall not prohibit Executive from purchasing or owning stock in a publicly traded corporation as long as Executive takes no part in the management, control or operation of said corporation.  Executive acknowledges and

Joe Dobson Consultant Agreement

4

agrees that the time period, geographical area, and scope of activity outlined in this provision are reasonable and are necessary to protect the Intellectual Property and the goodwill of AFT. However, if this Agreement Not to Compete is determined by a court of competent jurisdiction to be invalid or unenforceable for any reason, such Agreement shall be interpreted to extend over the maximum period of time, geographical area and scope of activity as to which it is valid and enforceable as determined by such court in such action.

4.      Representations and Warranties of Executive. Executive hereby represents and warrants to AFT and specifically agrees that:

  a.      Neither the execution of this Agreement by Executive nor the performance of Executive of his contractual duties constitute a breach of any agreement or covenant not to compete, confidentiality agreement or any other contract to which Executive may be subject.

  b.      AFT shall have the right to disclose the obligations imposed upon Executive by this Agreement to future or prospective employers and/or business associates of Executive.

  c.      The representations, warranties and agreements of Executive, as set for this in this Agreement, shall survive the termination of this Agreement.

5.      Remedies. In the event of a breach or threatened breach of this Agreement, AFT shall be entitled to an injunction restraining or otherwise prohibiting Executive from disclosing any Intellectual Property and/or from rendering any services to a competitive business and/or from using any of the Inventions in a way which is inconsistent with AFT's ownership thereof. In addition to its right to pursue such injunctive relief, AFT may pursue any other remedies available for such breach or threatened breach, including the recovery of monetary damages from Executive.

6.     Binding Effect. This Agreement shall be binding upon the parties hereto and upon their
respective executors, administrators, legal representatives, successors and assigns.

7.     Applicable Law. This Agreement shall be governed by the laws of the Province of Quebec,
Canada without giving effect to the choice-of-law rules thereof. If any provision of this
Agreement is declared void, the remaining provisions shall remain in full force and effect.

8.     Final Agreement. This Agreement cancels all previous agreements, written or oral, relating to
the subject matter hereof and shall not be changed orally. This Agreement will not be affected
by any present or future policy statement issued by AFT.

9.     Attorney's Fees. Each party shall be responsible for their own attorneys' fees if either party
engages an attorney in connection with a breach or threatened breach of this Agreement, or to
otherwise enforce its terms.

In witness whereof, the parties have executed this Agreement effective on the date first set forth
above.

Air FieldTurf Inc.

Per: _____

    John Gilman, CEO                             Joe Dobson